**GEORGE R. WHITTEN, JR., INC., doing business as Whitten Corporation, Plaintiff, Appellant,**

v.

**PADDOCK POOL BUILDERS, INC., et al., Defendants, Appellees.**

**No. 7381.**

United States Court of Appeals, First Circuit.

Heard Nov. 3, 1969.

Decided March 25, 1970.

---

John E. Lecomte, Boston, Mass., with whom Princi & Lecomte, Boston, Mass., was on brief, for appellant.

John D. Hawke, Jr., Washington, D. C., with whom Paul A. Good, Lynn, Mass., Arnold & Porter, Washington, D. C., and Butterworth & Good, Lynn, Mass., were on brief, for appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This is an appeal from a summary judgment dismissing plaintiff-appellant's civil antitrust complaint. Appellant, George R. Whitten, Jr., Inc. [Whitten] is in the business of designing and manufacturing swimming pool gutters and accessory equipment and of serving as general contractor for the construction of entire swimming pool facilities. Appellees are three affiliated corpora-

tions [hereinafter, singly Paddock] [1] which engage in the same business. Both Whitten and Paddock specialize in the manufacture of prefabricated "pipeless" pool gutters, which include recirculation equipment as an integral part of the gutter assembly and thus eliminate the need for pipe buried around the perimeter of the pool. Paddock's product, the "Integral Flow Recirculation System", is patented; Whitten's basically similar product, the "Uniflow System", apparently is not.

The case arises out of the efforts of both parties to sell their products to public bodies acting under competitive bidding procedures. Whitten's complaint charges that Paddock's selling efforts have violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and § 3 of the Clayton Act, 15 U.S.C. § 14. Specifically, counts I through III of the complaint allege that Paddock and its various dealers and representatives violated § 1 of the Sherman Act by conspiring to require the use of its own specifications in the public swimming pool industry, with the intent to exclude all others, accompanying this effort with misrepresentations regarding Whitten, and threats of litigation and harassment directed to Whitten and its present or prospective customers. Counts III–VI describe roughly the same acts as attempts to monopolize in violation of § 2 of the Sherman Act. Count VII alleges that Paddock has violated the Clayton Act by representing to public customers that they must use Paddock accessories whenever they use Paddock's patented gutter system.

During the process of taking depositions, Paddock moved for summary judgment, conceding for the purpose of the issue raised by the motion that it had combined with dealers and others to effect the use of its specifications in the public swimming pool industry, that its

specifications were so drawn that only it could comply, and that its purpose was to eliminate competition. It further conceded that these propositions "substantially embody" all of Whitten's Sherman Act allegations. The court granted the motion for summary judgment, without opinion, but in the context of briefs and argument directed to the proposition that Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) immunizes from antitrust law liability all efforts to induce governmental bodies to take action, notwithstanding the motives of the inducers. The case comes to us on the basis of the pleadings, answers to interrogatories, depositions, and an affidavit.

Our standard, of course, is whether, viewing the evidence favorably to Whitten, there is any fact in dispute which could be material to resolution of the legal issue. Rogen v. Ilikon Corp., 361 F. 2d 260, 266 (1st Cir. 1966). Paddock, using a perfectly proper tactic to bring sudden death to litigation which could be protracted, has conceded far more concerning its motives and techniques than any subsequent proof might establish. We judge it therefore by the following artificially stark set of facts.

The market for pipeless swimming pools is both relatively new and quickly expanding. Thus far, however, the greater initial expense of such pools has limited sales almost exclusively to public bodies or private bodies using public funds and subject to public bidding procedures. Although the number of firms supplying equipment for pipeless pools is unclear, Paddock is apparently the largest by far, doing business to some extent in all states, having at least 45 dealers, and making 20 times the installations as Whitten.

The public and quasi-public agencies who form the primary market for both

---

1. Paddock of California, Inc. franchises dealers with the right to use its trade names, trademarks, and patents. Paddock Pool Equipment Co., Inc. manufactures water circulation and filtration systems

and other accessories for swimming pools. Paddock Pool Builders, Inc. constructs and installs swimming pools in the northeastern part of the United States, using products of Paddock Pool Equipment Co.

Whitten and Paddock operate under a multiplicity of state and local bidding procedures, a factor which poses considerable difficulty in disposing of this case on summary judgment.[2] Nevertheless, the following skeleton procedure seems to be common. When a public body—for example, a school board—has received the authorization to construct a pool, it retains an architect or engineer to supervise the job. He then determines what products are available and prepares the technical specifications on which bids will be based. These specifications are then submitted to local authorities for clearance under health and building codes and finally to the school board. The school board, usually placing heavy reliance on the judgment of the architect, approves the specifications and invites bids. At this point, manufacturers may seek to have their products approved as equals to, or acceptable substitutes for, the equipment described in the specifications, but time is extremely short and the protests of rival suppliers are usually referred to the architect who drew up the original specifications.

Obviously, then, the original drafting of specifications is a critical stage for suppliers of pool equipment. Both Paddock and Whitten try to influence architects at this stage by publishing descriptions of their products in architectural catalogues. In addition, when Paddock learns of a forthcoming public pool project, one of its agents or dealers visits the architect charged with supervising the bidding. While Whitten also attempts to enter the scene at this early stage, its more limited resources prevent it from doing so on the same broad scale as Paddock. Paddock endeavors, with a high degree of success, to persuade the architect to adopt Paddock's own specifi-

cations. One witness deposed that "a good many architects * * * have evidently not written any specifications at all but allow Paddock to do so or used the specifications which Paddock supplied." These specifications are on their face neutral technical descriptions of generally available pool accessories, but a closer inspection reveals that they describe Paddock's products—and only those—in a variety of ways. They require that the recirculating and filtering systems be purchased from a manufacturer who has produced them for specified number of years—which only Paddock has done. Much of the equipment is described in a way that would rule out features of Whitten's equipment. The filter specification goes so far as to refer to Paddock equipment by Paddock's catalogue number. While the specifications provide for "an approved equal" for the described equipment, the specific functional or structural requirements would rule out the practicable possibility of an equal being accepted. Moreover, the time limitations on one who would submit a bid on alternative designs and equipment make such submission next to impossible.

Associated with this pressure to persuade architects to accept Paddock's proprietary and exclusionary specifications is other conduct which, under the ground rules of this case, we are to take as established. This includes falsely advertising that Paddock is the only manufacturer of pipeless swimming pool equipment and that its designs have benefitted from its national swimming program—which in fact is non-existent; false statements about Whitten's lack of experience; and threats of litigation against public bodies and contractors who have contracted with Whitten or contemplate doing so.[3]

2. For example, in the critical area of product and specification approval, the federal government maintains elaborate independent testing services and a system of appeals to the Comptroller General for suppliers aggrieved by decisions of the contracting authority. *See* R. Nash and J. Cibinic, Federal Procurement Law, 170–

177 (1966). State and local authorities, however, sometimes delegate this function entirely to so-called "strong" architects hired to supervise a particular project.

3. Paddock feels that these allegations are not germane, in part because deception does not vitiate an otherwise valid *Noerr*

We are therefore confronted, for the purposes of this appeal, with government acting in a proprietary capacity, purchasing goods and services to satisfy its own needs within a framework of competitive bidding, where the initial responsibility for recommending specifications has been entrusted to a hired professional, and where the selling effort directed at that professional and his public client by a leading supplier was monopolistically motivated and ran the gamut from high pressure salesmanship to fraudulent statements and threats.

■ Paddock is willing to present its case in this posture—as it says, "The most extreme state of facts imaginable" —because of its confidence in the proposition that efforts by private parties to influence the actions of government cannot violate the antitrust laws, even though such efforts are intended to eliminate competition. In support of this proposition, Paddock advances two separate but related principles of antitrust exemption. First, drawing on Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), Paddock argues that restraints of trade which result from valid governmental action cannot give rise to private antitrust liability. Second, relying primarily on Eastern Railroad Presidents Conference v. Noerr Motor Freight, *supra,* and United Mine Workers of America v. Penning-

ton, 381 U.S. 657, 85 S.Ct. 1585, 14 L. Ed.2d 626 (1965), Paddock maintains that joint efforts to influence public officials are beyond the scope of the antitrust laws.[4]

■ These propositions find ample support in the language of the Supreme Court opinions on which Paddock relies. None of these cases, however, addresses the factual profile presented here,[5] and we are particularly reluctant to rely on verbal formulae to solve problems of antitrust liability. The Sherman Act has been interpreted as "a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." Northern Pacific Ry. Co. v. United States, 356 U. S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). In the light of this purpose, courts in considering conspiracies to restrain trade have held that, "It is not the form of the combination or the particular means chosen but the result to be achieved that the statute condemns." American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). In a similar vein, courts have condemned otherwise innocent practices if exploited to achieve or maintain monopoly power. United States v. Griffith, 334 U.S. 100, 66 S.Ct. 941, 92 L.Ed. 1236 (1948); United States v. United Shoe Machinery Corp., 110 F.Supp. 295 (D.Mass.1953), aff'd

defense, 365 U.S. at 145, 81 S.Ct. 523, and in part because Whitten has not challenged the validity of Paddock's patent. *Noerr,* apart, however, we think systematic tale-telling coupled with other relevant factors such as conspiracy or monopoly power may constitute an antitrust violation. We also doubt whether one must as a matter of law challenge the validity of a patent in order to complain of the uses to which it is put. *Cf.* United States v. Singer Manufacturing Co., 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963).

4. While the two doctrines are often treated as one, we agree with Paddock's separate treatment of each. The two are not coterminous. For example, an unsuccessful attempt to influence government action may fall within the *Noerr-Pennington* immunity, but not the *Parker* immunity.

Conversely, a state regulatory agency may decide to restrain competition without prompting; the beneficiaries, not having solicited government action, would enjoy a *Parker* immunity but not one based on *Noerr-Pennington.* Moreover, because of its First Amendment overtones, the *Noerr-Pennington* immunity is arguably broader than the *Parker* exemption.

5. Paddock has cited one lower court decision, United States v. Johns-Manville Corp., 259 F.Supp. 440 (E.D.Pa.1966), which involved substantially similar facts and raised, among others, the precise issue raised here. The court, relying on *Noerr* and *Pennington,* granted summary judgment for defendant without extended analysis. For reasons which we express in the text, we disagree with this broad application of the *Noerr-Pennington* rule.

per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). There are occasional exemptions from the rule of unfettered competition for particular forms of combination and particular kinds of anti-competitive practices, but these exemptions are narrowly construed. *Cf.* United States v. Borden Co., 308 U.S. 188, 196–202, 205–206, 60 S.Ct. 182, 84 L.Ed. 181 (1939); Silver v. New York Stock Exchange, 373 U.S. 341, 347–349, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 216–220, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966). With these strictures in mind, we turn to examination of the tributary doctrines on which Paddock relies for its claim of antitrust immunity.

## THE PARKER v. BROWN IMMUNITY

We ask first whether the adoption of Paddock's specifications by public bodies brings Paddock within the protection of Parker v. Brown, *supra.* *Parker* grew out of the efforts of a packer of raisins to enjoin the operation of California's agricultural marketing scheme. The object of the scheme was to avoid ruinous competition by placing a certain percentage of every grower's crop within the control of a committee of growers and packers, who could then sell or withhold the produce as conditions dictated. The Supreme Court assumed that this program would violate the Sherman Act if it had been the product of private agreement. The Court, however, stressed that the program had been established under state legislation and was administered by a group appointed by the Governor and confirmed by the State Senate. In the light of these indications of deliberate government guidance, the Court concluded:

> "We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitu-

tion, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." 317 U.S. at 350–351, 63 S.Ct. at 313.

■ The Court's emphasis on the extent of the state's involvement precludes the facile conclusion that action by any public official automatically confers exemption. As one commentator has observed, the assertion that an act is "valid governmental action * * * suggests inquiry rather than ends it. * * * Generally, the underlying issue in determining the applicability of such an exemption is the degree of governmental involvement in, and supervision over, the allegedly wrongful private activity." Comment, Alabama Power Company v. Alabama Electric Cooperative, Inc., 55 Va.L.Rev. 325, 345–346 (1969). Our reading of *Parker* convinces us that valid government action confers antitrust immunity only when government determines that competition is not the *summum bonum* in a particular field and deliberately attempts to provide an alternate form of public regulation.

In terms of such deliberate governmental occupation of a field normally left to the free winds of competition, this case falls at the opposite end of the spectrum from *Parker.* At the *Parker* end of the spectrum lie cases like Trucking Unlimited v. California Motor Transport Co., 1967 Trade Cas., ¶ 72,-298 (N.D.Cal.1967), a case involving certification of common carriers, where the deliberate choice of a regulatory agency intervened between the private anti-competitive activity and the resulting restraint on trade, or cases like E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52 (1st Cir. 1966), cert. denied, 385 U.S. 947, 87 S. Ct. 320, 17 L.Ed.2d 226 (1967), a suit involving an airport service franchise, where a state agency exercised broad authority to manage a monopoly in the

public interest.[6] Even at this end of the spectrum, no exemption will be found if state encouragement of price stability falls short of the delegation and approval in *Parker*. *See* Schenley Indus., Inc. v. New Jersey Wine & Spirit Wholesalers Ass'n, 272 F.Supp. 872 (D.N.J. 1967); *cf.* United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 561–562, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944).

The middle of the spectrum is occupied by cases in which the state has chosen to regulate a field, but state policy is neutral or silent with respect to restraints of trade. Since there is no conflict in such cases between state regulatory action and the policy of unfettered competition, the courts have found no difficulty in denying antitrust immunity. Northern Securities Co. v. United States, 193 U.S. 197, 347–350, 24 S.Ct. 436, 48 L.Ed. 679 (1904), cited in Parker v. Brown, *supra*, at 317 U.S. 351, 63 S.Ct. 307; Travelers Insurance Co. v. Blue Cross of Western Penn., 298 F. Supp. 1109 (W.D.Pa.1969); *cf.* Asheville Tobacco Board of Trade, Inc. v. FTC, 263 F.2d 502 (4th Cir. 1959).

■ In the case at bar, however, the state policy is neither anti-competitive nor neutral. When the government acts under laws requiring competitive bidding, it signifies its intent to respond to the signals of a competitive market on the same terms as any other consumer, an intent which is entirely consistent with the aims of the Sherman Act. This intent would be frustrated, and the ultimate cost to the public substantially increased, if some sellers could nevertheless engage in anti-competitive practices merely because they were dealing with the government. For example, suppose the plaintiff here was not a rival of Paddock, but a group of school boards seeking treble damages under the doctrine of Georgia v. Evans, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (1942). It would be anomalous to dismiss the school boards' suit on the grounds that, by adopting Paddock's specifications, they had conferred immunity on monopolistic practices which they had never considered, which they lacked the authority to approve, and which undermined the entire process of competitive bidding. We conclude, therefore, that the adoption of Paddock's specifications by public bodies does not bring Paddock within the exemption for valid governmental action.

## THE NOERR-PENNINGTON IMMUNITY

Assuming that Paddock's conduct is not protected by the doctrine of Parker v. Brown, we next consider whether such conduct falls within the teaching of Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., *supra*, and United Mine Workers v. Pennington, *supra*, which hold that joint efforts to influence public officials in the passage or enforcement of laws are beyond the scope of the antitrust laws. The basic case is *Noerr* which grew out of a dispute between railroads and truckers. The railroads mounted an intensive but misleading publicity campaign to obtain anti-trucker legislation and to persuade the governor of a state to veto a pro-trucker bill. The truckers then brought suit, charging a conspiracy in restraint

6. *See also* Okefenokee Rural Electric Membership Corp. v. Florida Power & Light Co., 214 F.2d 413 (5th Cir. 1954) (state regulation of electric power lines along rights of way); Alabama Power Co. v. Alabama Electric Cooperative, Inc., 394 F.2d 672 (5th Cir. 1968), cert. denied, 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968) (conditions imposed on loan by Rural Electrification Administration); Miley v. John Hancock Mutual Life Insurance Co., 148 F.Supp. 299 (D.Mass. 1957), aff'd, 242 F.2d 758 (1st Cir. 1957) (state commission awarding insurance contract); Independent Taxicab Operators' Ass'n of San Francisco v. Yellow Cab Co., 278 F.Supp. 979 (N.D.Cal.1968) (awarding taxi stand concession under state law permitting exclusive awards). For an excellent summary of the law on conflicts between federal regulatory action and the Sherman Act, *see* Northern Natural Gas Co. v. FPC, 130 U.S.App. D.C. 220, 399 F.2d 953, 959–961 (1968).

of trade. The Supreme Court reversed judgments of liability on two grounds. First the Court noted that:

> "To hold that the government retains the power to act in [a] representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of the Act." 365 U.S. at 137, 81 S.Ct. at 529.

The Court then defined as "of at least equal importance" the "right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws," 365 U.S. at 139, 81 S.Ct. at 530, a right protected by the First Amendment. The Court added that financial self-interest was an important motive in prompting citizens to participate in government.

The key to this decision, in our opinion, is the Court's heavy emphasis on the political nature of the railroad's activities and its repeated reference to the "passage or enforcement of laws." The entire thrust of *Noerr* is aimed at insuring uninhibited access to government policy makers. A pluralistic society moves by many motives. The hope, supported by history, is that permitting every interest to be heard will produce a tolerable amalgam responsive to the needs of a given time. But the efforts of an industry leader to impose his product specifications by guile, falsity, and threats on a harried architect hired by a local school board hardly rise to the dignity of an effort to influence the passage or enforcement of laws. By "enforcement of laws" we understand some significant policy determination in the application of a statute, not a technical

decision about the best kind of weld to use in a swimming pool gutter. *Noerr* alone, then, does not support Paddock's position.

*Noerr* was followed by *Pennington*, a case involving an effort by large mine operators and union officials to persuade the Secretary of Labor to prescribe higher minimum wages for companies selling coal to the TVA on long-term contracts. This effort at persuasion would seem to fall well within the *Noerr* immunity for attempts to influence the enforcement of laws. The Walsh-Healy Act, 41 U.S.C.A. § 35 *et seq.*, conferred considerable discretion on the Secretary of Labor to set wage levels in the public interest, and required the Secretary to observe the strictures of the Administrative Procedure Act, including notice, public hearing, and judicial review, in making wage rulings. 41 U.S.C. §§ 35(b), 43a; Costilo, AntiTrust's Newest Quagmire: The Noerr-Pennington Defense, 66 Mich.L.Rev. 333, 344–345 (1967).[7] Nevertheless, the trial court instructed the jury that efforts to influence the Secretary were illegal if part of a broader conspiracy to drive small mineowners from business. Pennington v. United Mine Workers, 325 F. 2d 804, 817 (6th Cir. 1963). The Court of Appeals took an even more restrictive view, holding that *Noerr* shielded only good-faith attempts to influence public officials, "unaccompanied by a purpose or intent to further a conspiracy to violate a statute." 325 F.2d at 817. In rejecting these restrictive views of *Noerr*, the Supreme Court observed:

> "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." 381 U.S.

---

7. Some have been troubled by the fact that the mineowners approached not only the Secretary of Labor, but also the TVA. *See* Note, Application of the Sherman Act to Efforts to Influence Government Action, 81 Harv.L.Rev. 847, 853 (1968).

However, since the TVA had the power to undermine the Secretary's decision by making "spot market" purchases from low wage operators, the mineowners' conduct seems a reasonable addendum to the main proceedings before the Secretary.

657 at 670, 85 S.Ct. 1585 at 1593, 14 L.Ed.2d 626.

Paddock seizes on this statement to buttress its position that efforts to influence any public official are exempt. In context, however, the Court's emphasis is not on the role of the public officials involved, but rather on the irrelevance of intent or conspiracy in applying the *Noerr* doctrine. Nevertheless, there remains the question of whether a particular attempt to influence a public official is the kind of political activity which *Noerr* protects. *Noerr* stressed the importance of free access to public officials vested with significant policy-making discretion. We doubt whether the Court, without expressing additional rationale, would have extended the *Noerr* umbrella to public officials engaged in purely commercial dealings when the case turned on other issues.

We find support for our reading of *Pennington* in Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). In *Continental Ore*, a private firm acting as administrator of Canada's wartime rationing program used its discretionary power to exclude a competing processor of vanadium ore from the Canadian market. The Supreme Court, stressing that there was no evidence that the Canadian government had approved of the conduct of its agent, held that such conduct was subject to the Sherman Act. In *Pennington*, the Court was careful to distinguish *Continental Ore* on the grounds that there was no indication that any Canadian official "would have approved of joint efforts to monopolize the production and sale of vanadium * * *." 381 U.S. at 671, 85 S.Ct. at 1594 n. 4. Presumably a different result would have followed if defendants in *Continental Ore*, instead of seeking to subvert the administration of the rationing program, had boldly sought a change of policy from executive or legislative officials. *See* Costilo, *op. cit.*, 66 Mich.L.Rev. at 347.[8]

█ The same logic applies in this case. The state legislatures, by enacting statutes requiring public bidding, have decreed that government purchases will be made according to strictly economic criteria. Paddock is free to seek legislative change in this basic policy, but until such change is secured, Paddock's dealings with officials who administer the bid statutes should be subject to the same limitations as its dealings with private consumers. Indeed, to hold otherwise might impair the effectiveness of competitive bidding. *See* Note, *op. cit.* n. 7, 81 Harv.L.Rev. at 851–852 (1968). We conclude, therefore, that the immunity for efforts to influence public officials in the enforcement of laws does not extend to efforts to sell products to public officials acting under competitive bidding statutes.

█ This conclusion does not, in our view, encroach on the freedom of speech and right to petition protected by the First Amendment. The First Amendment does not provide the same degree of protection to purely commercial activity that it does to attempts at political persuasion. *Cf.* Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942); Breard v. City of Alexandria, 341 U.S. 622, 641–643, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). Moreover, the First Amendment does not prevent government from adopting reasonable rules for regulating the conduct of

8. Unlike Paddock, we do not read *Continental Ore* to mean that any action by a Canadian public official would have resulted in exemption. An anti-competitive practice may receive only the most cursory inspection by public officials, *see* Woods Exploration Co. v. Alcoa, 36 F.R.D. 107 (S.D.Texas 1963), or public officials may approve conduct without consideration or awareness of its anti- competitive aspects. *Cf.* Angle v. Chicago, St. Paul, Minneapolis and Omaha Rwy. Co., 151 U.S. 1, 14 S.Ct. 240, 38 L.Ed. 55 (1893). The issue in such cases is not whether the action was in form "governmental", but whether the real decision makers were public officials or private businessmen. *See* American Bar Association, 1955–1968 Antitrust Developments, 211–12 (1968).

**34**

those who seek its favor. United States v. Harriss, 347 U.S. 612, 625–626, 74 S. Ct. 808, 98 L.Ed. 989 (1954). Finally, Paddock's right to tout its wares to government agencies, unlike the right to seek legislation involved in Noerr, is purely a creature of statute and must be exercised within the confines of bidding procedures designed to insure the maximum possible competition for the government's expenditures. In the light of these considerations, we see no constitutional objection to requiring that Paddock observe the same limitations in dealing with the government as it would in dealing with private consumers.

Nor do we see the practical difficulties which trouble Paddock. Paddock argues that by denying immunity we cast doubt on the legality of many existing public contracts and will in the future force public bodies to forego patented products and "procure at the lowest common denominator". Paddock has, however, confused the narrow issue of whether its conduct is exempt from antitrust regulation with the broader issue of whether it has in fact violated the Sherman Act. We address only the question of exemption; we intimate no view on whether a violation has actually occurred. Paddock's conduct may on inspection prove to be the muscle flexing of a budding monopolist, or it may prove to be no more than a vigorous selling effort. Nor do we mean to condemn the publication of proprietary specifications. Such specifications undoubtedly provide a useful service to architects and engineers. We hold only that the legality of Paddock's selling methods is to be judged without regard to whether its customer is a private consumer or a public official acting under a competitive bidding statute. Those who sell to private developers under competitive bid-

ding procedures have never enjoyed antitrust immunity. We doubt whether applying the same standard to dealings with public customers will prompt a wholesale repudiation of contracts or hamstring the efforts of public bodies to buy desirable products.[9]

On the other hand, we think that such an even-handed rule will promote the policy of free and unfettered competition which underlies the Sherman Act. Government is the largest single customer in our economy, with expenditures amounting to over $150 billion in 1966. Note, *op. cit.* n. 7, 81 Harv.L.Rev. at 847 n. 3. Occasionally, government may encourage activity which would otherwise violate the antitrust laws, *e. g.*, 50 U.S. C. App. § 2158, or use its purchasing power to promote broader objectives of public welfare, *e. g.*, Walsh-Healy Act, 41 U.S.C. § 35(b). In this case, however, the government bodies which Paddock sought to influence were acting under elaborate bid procedures designed to insure that purchases were based solely on economic considerations. To hold that Paddock's conduct is exempt in such circumstances would be tantamount to a grant of total immunity for commercial dealings with the government. Our national reliance on the market to efficiently allocate resources would be misplaced if dealings with the nation's largest customer were totally exempt. We therefore hold that efforts to influence government officials acting under statutes requiring competitive bidding are within the scope of the antitrust laws.

## TYING AGREEMENTS

Paddock has also moved to strike those portions of the complaint in which Whitten alleges that Paddock violated § 3 of the Clayton Act and § 2 of the

9. Our reliance on state bidding statutes should not be taken as approval of Whitten's argument that Paddock's selling efforts fall within the Sherman Act because Paddock's specifications are illegal under state bidding statutes. State law on the validity of restrictive specifications varies widely. 63 C.J.S. Municipal Corporations § 1149: 43 Am.Jur. Public Works and Contracts §§ 16–17. We do not, therefore, equate immunity with legality under state law. Rather, we rely on bidding statutes as clear indicia that government is acting as a consumer rather than as a regulator.

Sherman Act by conditioning the sale of Paddock's patented gutter system on the purchase of Paddock accessories. These allegations, if true, would certainly constitute violations of the antitrust laws. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Fortner Enterprises v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). Paddock, however, moved for summary judgment on the grounds that Whitten had failed to show any evidence of the illegal condition or agreement which is the gravamen of a tying offense.

As evidence of an illegal condition, Whitten relies primarily on the terms of Paddock's specifications, which, as we have seen, are widely adopted by contracting authorities. This document requires that a single manufacturer supply all the elements of the water recirculation system and expresses a preference for manufacturers who can supply accessories as well as recirculation equipment. Since only Paddock can meet these terms, a contracting authority which adopts Paddock's specifications in order to obtain its gutter system will eventually purchase an entire equipment package from Paddock.

In reply, Paddock argues that the specifications, whatever their restrictive effect, are not an agreement between Paddock and the contracting authority, but are instead guidelines freely adopted by the contracting authority for the use of potential bidders. In Paddock's view, the tying effect in this case results not from an illegal agreement imposed by the seller, but from the buyer's desire to insure that

his bidders supply complementary equipment of high quality.[10]

Whatever the ultimate merits of this argument, we must view it through the prism of summary judgment, which should be granted only when the truth is clear, when no material fact remains for trial, and when the moving party is entitled to judgment as a matter of law. Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944). The Supreme Court has often expressed its reluctance to dispose of complex issues of economic fact through the relatively blunt tool of summary judgment. White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948). Moreover, a court has discretion to deny an otherwise justified motion for summary judgment if the arguments of the parties have failed to clarify the underlying facts, cf. Kennedy v. Silas Mason Co., supra at 256, 68 S.Ct. 1031, or if the motion is tainted with procedural unfairness. Williams v. Howard Johnson's of Washington, Inc., 323 F.2d 102, 107 (4th Cir. 1963); 6 J. Moore, Federal Practice ¶ 56.15(6).

In the light of these teachings, we think that the summary judgment on the tying issue should not stand. The gist of Paddock's defense is that the restrictive specifications were not imposed by the seller, but freely adopted by the buyer. But the fact—which we must assume for purposes of summary judgment—that many contracting authorities are willing to adopt Paddock's restrictive specifications, contrary to their apparent economic interest, provides at

10. In advancing this argument, Paddock places heavy reliance on the deposition of Mr. George Whitten, president of Whitten, Inc., who admitted that he did not intend to allege that Paddock refused to sell its gutter system unless the purchaser also agreed to buy accessory equipment. This admission, however, must be qualified by Mr. Whitten's later allegation that Paddock has engaged in discriminatory pricing which had the effect of a refusal to deal. Moreover, a seller need not refuse to sell his tying product outright in order to induce purchasers to enter an illegal tying agreement; he may, for example, offer discounts for those who purchase both tying and tied products or threaten litigation against those who refuse to accept the whole package. Mr. Whitten's admission does not, therefore, dispose of the tying issue as a matter of law.

**36**

least some basis for inferring an illegal understanding. *Cf.* Interstate Circuit, Inc. v. United States, 306 U.S. 208, 221–227, 59 S.Ct. 467, 83 L.Ed. 610 (1939). The record also contains allegations of several instances in which Paddock used threats of patent infringement litigation to persuade reluctant purchasers of the merits of its gutter system. When the "tying" product is patented, an infringement suit can be a powerful weapon in controlling the market for the unpatented "tied" products. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 493–494, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Certainly, the tying issue would appear in a very different light if buyers regularly adopted Paddock's specifications in order to avoid litigation rather than because of the intrinsic merit of Paddock's products. Of course, unfavorable inferences about the motives of Paddock and its customers may be readily rebutted by appropriate evidence, but the arguments of counsel cannot supply the lack of such evidence in the record before us. On the basis of this scanty record, we cannot say that Paddock has conclusively dispelled the possibility of an illegal condition or understanding. Norfolk Monument Co., Inc. v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969).

In addition, the record on appeal reveals considerable confusion about what Paddock conceded for purposes of its motion for summary judgment. In argument before the trial court, counsel for Paddock described his motion as essentially a motion to dismiss and stated that Paddock would concede all the material facts of the complaint. Counsel immediately clarified what this concession entailed for purposes of the first issue, the *Noerr-Pennington* defense, but failed to make his meaning clear with respect to the second issue, the tying agreement. As a result, counsel for Whitten, thinking that Paddock's motion raised only legal issues, declined the trial court's offer of additional time to complete the taking of depositions. As a further result, Whitten on appeal has

relied on Paddock's concession, while Paddock has argued that Whitten introduced no evidence of an illegal understanding. We do not pause to apportion blame for this confusion, nor do we hold that such misunderstandings bar summary judgment in every case. In this case, however, we have already decided that there must be a remand to consider Whitten's charges of conspiracy and attempt to monopolize. Both these allegations and the charges of illegal tying arrangements seem to turn on essentially the same facts. We therefore conclude that sensible judicial administration requires that we give the parties additional opportunity to develop the facts relevant to the alleged tying arrangements.

The judgment granting summary judgment for the defendant is vacated and the case is remanded for proceedings not inconsistent with this opinion.