**STATE OF NEW MEXICO, on behalf of itself and all other public bodies in the State of New Mexico similarly situated, Plaintiffs-Appellees,**

v.

**AMERICAN PETROFINA, INC., et al., Defendants-Appellants.**

**No. 26182.**

United States Court of Appeals, Ninth Circuit.

July 17, 1974.

William Simon (argued) of Howrey, Simon, Baker & Murchison, Washington, D. C., for defendants-appellants.

Josef D. Cooper (argued) of Friedman, Koven, Shapiro, Saltzman, Koenigsberg, Specks & Homer, Chicago, Ill., Perry Goldberg (argued), Chicago, Ill., for plaintiffs-appellees.

Before BROWNING and WRIGHT, Circuit Judges, and KING, District Judge.*

OPINION

EUGENE A. WRIGHT, Circuit Judge:

In this case we must decide whether a state is liable for alleged violations of sections 1 and 2 of the Sherman Act.[1] We hold that it is not and affirm the district court's order dismissing the Shell Oil Company's counterclaim against the State of New Mexico.

New Mexico, on behalf of itself and all other public bodies in New Mexico similarly situated, sued Shell and five other asphalt suppliers for alleged antitrust violations. Shell counterclaimed, alleging that New Mexico and some of its political subdivisions conspired as consumers of asphalt to fix prices and eliminate competition among themselves, in violation of sections 1 and 2 of the Sherman Act [15 U.S.C. §§ 1, 2]. The district court dismissed Shell's counterclaim, holding that the Sherman Act is not applicable to the conduct of a state. That court certified the case for interlocutory appeal under 28 U.S.C. § 1292 (b), and we granted leave to take an interlocutory appeal.

The issue on appeal is whether sections 1 and 2 of the Sherman Act apply to the conduct of a state[2] and whether sections 4 and 16 of the Clayton Act [15 U.S.C. §§ 15, 26] afford Shell the remedies it seeks.[3] Since sections 4 and 16

---

* Of the District of Hawaii.

1. This is a question of first impression for this court. The issue was presented as to a county in Security Fire Door Company v. County of Los Angeles, 484 F.2d 1028 (9th Cir. 1973), but the case was decided on other grounds, see id. at 1030 n.2.

2. Section 1 of the Sherman Act, as amended, [15 U.S.C. § 1] provides in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . . Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

Excepting two provisos, not here relevant and deleted from the above quotation, and an increase in the magnitude of the fine, the language of 15 U.S.C. § 1 is substantially the same as when originally enacted. See 26 Stat. 209, ch. 647 § 1 (1890).

Section 2 of the Sherman Act, as amended, [15 U.S.C. § 2] provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

Except for an increase in the magnitude of the fine, 15 U.S.C. § 2 is identical to the original enactment. See 26 Stat. 209, ch. 647, § 2 (1890).

3. Shell seeks treble damages, costs and attorneys' fees along with injunctive relief. Section 4 of the Clayton Act, as amended [15 U.S.C. § 15] provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

This language has not been altered since its original enactment. See 38 Stat. 731, ch. 323, § 4. It is similar to section 7 of the Sherman Act [26 Stat. 210, ch. 647, § 7] (1890), now repealed.

Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any circuit court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee.

of the Clayton Act provide remedies only for violations of the antitrust laws, and since the only alleged violations are of sections 1 and 2 of the Sherman Act, our primary inquiry is whether sections 1 and 2 apply to the conduct of a state.

By its very terms, section 2 applies only to "persons," and while section 1 invalidates "[e]very contract, combination . . . or conspiracy, in restraint of trade," the remedial portion of section 1 is directed only to "persons." Thus, the Supreme Court has stated that the "[Sherman] Act is applicable to 'persons' including corporations." Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Of course, this merely shifts the inquiry to one concerning the meaning of "person" as that term is used in the Sherman Act.

Section 8 of the Sherman Act [15 U. S.C. § 7] defines "person" as used in the Act as follows:[4]

> The word "person", or "persons", wherever used in sections 1 to 7 of this title shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country.

Since the term is explicitly defined for use throughout the statute and the definition does not include states, there is at least a strong implication that states were not intended to be subject to the Act. *See* Georgia v. Evans, 316 U.S. 159, 163, 62 S.Ct. 972, 86 L.Ed. 1346 (1942) (Roberts, J., dissenting). This methodology seems precluded, however, by the majority approach in *Evans*. There the Court considered whether a state was a "person" who could sue for treble damages under section 7 of the Sherman Act, the forerunner of 15 U.S. C. § 15. Notwithstanding the fact that states were not mentioned in the definition of "person" under section 8 of the Sherman Act, the Court held that a state was a "person" under section 8 and could sue for treble damages under section 7. The Court stated that the definition of "person" must be interpreted in light of the "purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute," 316 U.S. at 161, 62 S.Ct. at 974, implicitly eschewing a literal or mechanical methodology.

Although the language of *Evans* supports an inference that sections 1 and 2 of the Sherman Act apply to states (by including states within the definition of "person"), its rationale refutes such a broad interpretation. The policies relied upon to define "person" referred only to the ability of a state to sue for treble damages; no mention was

We note that Section 4 of the Clayton Act omits the language "by any other person or corporation" used in Section 7 of the Sherman Act. The omission might give rise to the inference that injuries need no longer be caused by "persons." The difference in language, however, seems to be without relevance. The Senate report on the bill repealing Section 7 of the Sherman Act indicates that the purpose of Section 4 of the Clayton Act was to provide a private remedy for violations of all "antitrust laws," not just violations of the Sherman Act. Sen.Rep.No. 619, June 21, 1955, H.R. 4954, 1955 U.S. Code Cong. & Admin.News, p. 2328. No significance was given to the fact that Section 4 of the Clayton Act omits the phrase "by any other person." In addition, in Georgia v. Evans, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (1942), the Court analyzed section 7 of the Sherman Act, which

was still in force, without any mention of the different language used in section 4 of the Clayton Act. Indeed, Justice Roberts, dissenting, relied on the very phrase that is missing from section 4 of the Clayton Act. 316 U.S. at 163, 62 S.Ct. 972. Had the difference been significant, analysis under section 7 would not have ended the inquiry for Justice Roberts.

Regarding injunctive relief, 15 U.S.C. § 26 provides in relevant part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws. . . .

4. An identical definition is found in section 1 of the Clayton Act [15 U.S.C. § 12].

made of states as defendants. It is, therefore, difficult to conclude that the Court intended actually to define "person" to include states everywhere in the Act. While it is normally desirable that a term be given a uniform meaning throughout an act, especially a term defined in a definitional section, the functional methodology of the *Evans* Court indicates a more flexible approach. At least it is difficult to conclude that a meaning seemingly broader than the facial meaning of the statutory definition applies throughout the statute when the justification for adopting that meaning refers only to a specific context in which the term is used.

This conclusion is supported by the language of Parker v. Brown, *supra,* 317 U.S. at 351, 63 S.Ct. at 313, decided less than a year after *Evans,* where the Court stated that the Sherman Act gives "no hint that it was intended to restrain state action." If the state were a "person" as that term is used everywhere in the Act certainly the Court would have found a "hint" that the Act restrained states since it clearly restrains "persons." Thus, we conclude that *Evans* does not apply beyond its factual context; it dealt only with the question whether a state can sue for treble damages under 15 U.S.C. § 15.

Parker v. Brown did more than negate the language in *Evans* indicating that a state is a "person" as that term is used everywhere in the Act. The *Parker* Court expressly declared that states are not subject to the Sherman Act:

> The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state. The Act is applicable to "persons" including corporations (§ 7), and it authorizes suits under it by persons and corporations (§ 15). A state may maintain a suit for damages under it, Georgia v. Evans, 316 U.S. 159 [62 S.Ct. 972, 86 L.Ed. 1346],

but the United States may not, United States v. Cooper Corp., 312 U.S. 600 [61 S.Ct. 742, 85 L.Ed. 1071]—conclusions derived not from the literal meaning of the words "person" and "corporation" but from the purpose, the subject matter, the context and the legislative history of the statute.

> There is no suggestion of a purpose to restrain state action in the Act's legislative history. The sponsor of the bill which was ultimately enacted as the Sherman Act declared that it prevented only "business combinations." 21 Cong.Rec. 2562, 2457; see also at 2459, 2461. That its purpose was to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations, abundantly appears from its legislative history. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 492–493 [60 S.Ct. 982, 84 L.Ed. 1311] and n. 15; United States v. Addyston Pipe & Steel Co., C.C., 85 F. 271, affirmed 175 U.S. 211 [20 S.Ct. 96, 44 L.Ed. 136]; Standard Oil Co. v. United States, 221 U.S. 1, 54–58 [31 S.Ct. 502, 55 L.Ed. 619].

317 U.S. at 351, 63 S.Ct. at 313.

Unlike the *Evans* language that was negated by *Parker,* there is no subsequent Supreme Court holding or language to undermine the conclusion that the Parker Court meant what it said. To the contrary, there are significant justifications for concluding independently that states were not intended to be covered by the Sherman Act. First, sections 1 and 2 of the Sherman Act provide for criminal sanctions, a remedy Congress would not lightly apply to states. We are reluctant to impute such an intention without a clear indication from Congress. And there is no indication that Congress intended the civil remedy provision of section 7 of the Sherman Act to have greater scope in terms of regulated conduct than section 1 or 2.[5] Second, even concerning the

---

5. Nor is there any indication that either section 4 or section 16 of the Clayton Act [15 U.S.C. §§ 15, 26] was intended to expand the scope of regulated conduct under sec-

civil remedy of treble damages provided by section 7 of the Sherman Act, the Eleventh Amendment would cause serious difficulties for such a suit against a state. Without a clear indication from Congress, we are reluctant to impute to Congress an intent that would raise such substantial constitutional problems.[6]

The fact that the two principal remedies of the Sherman Act as originally enacted are of dubious propriety if applied to states,[7] the absence of any mention of state action in either the Act or the legislative history, and the language of Parker v. Brown quoted above lead us to conclude that sections 1 and 2 of the Sherman Act do not apply to the activities of a state.[8]

We have yet to confront Shell's argument, however, based on recent cases, that *Parker* does not confer absolute immunity from antitrust liability upon the states. Shell's position essentially is that only where a state's *legislature* af-

firmatively decides that competition "is not the *summum bonum* in a particular field and deliberately attempts to provide an alternate form of public regulation," George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25, 30 (1st Cir. 1970), is the state immune from antitrust liability. Shell relies upon the language and factual situation of *Parker* and a number of cases interpreting *Parker*, primarily Hecht v. Pro-Football, Inc., 144 U.S.App.D.C. 56, 444 F.2d 931 (1971), cert. denied 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972).

In *Parker*, the California legislature authorized state officials to regulate the marketing of California agricultural products to restrict competition and prevent economic waste. The legislature authorized the creation of a commission, composed of the State Director of Agriculture and others appointed by the governor, to oversee the program. Upon application by ten producers, the commission was authorized to appoint a

---

tions 1 and 2. They merely provided additional remedies for conduct prohibited elsewhere in the Acts.

6. Since we hold that Shell's claim does not state a cause of action under the Sherman Act, we need not consider the question whether the fact that Shell's complaint is a counterclaim circumvents the proscription of the Eleventh Amendment. Nor does the analysis depend upon a holding, and therefore we do not hold, that the Eleventh Amendment would bar a suit for treble damages against a state under the Sherman Act. The point is that the Eleventh Amendment raises such serious questions concerning such a suit that it is unlikely that Congress had a futile intent to apply the Sherman Act to the states. And even if a counterclaim would not be barred, it is unlikely that Congress intended to apply the Sherman Act to the states merely to cover the counterclaim situation. It should be noted in this regard that, as originally enacted, the Sherman Act provided for no private injunctive relief. And there is no indication that including private injunctive relief in Section 16 of the Clayton Act [15 U.S.C. § 26] expanded the substantive scope of the Sherman Act.

7. The difficulty of applying the third remedy, forfeiture of property under section 6 of the Sherman Act [15 U.S.C. § 6], seems no more benign than those mentioned in connec-

tion with treble damages and criminal sanctions.

8. This conclusion is not necessarily contrary to the policies one might discern in the antitrust laws. It is true that the Sherman Act was intended to protect competition, *see* Apex Hosiery Co. v. Leader, 310 U.S. 469, 492–493 & n.15, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). But the problem presented by the trusts of 1890 was not only that they prevented competition detrimentally to consumers, but also that they were, in a laissez-faire economy, able to do so unchecked by popular control of any type. While states might act anti-competitively, they do not do so unchecked by popular control. Thus, it is possible to conclude that the Sherman Act was aimed at controlling anti-competitive elements where there was no available remedy rather than at controlling all possible anti-competitive entities, including states. Of course, this is not the only reasonable interpretation of the Sherman Act's policies, but is a reasonable one which at least shields our holding from the claim that it is inconsistent with any reasonable purpose Congress could have had in mind.

We also note that where a state's activities affect the economy of another state, to whose citizens it is not responsible politically, the activity must be carried out within the confines of the Interstate Commerce clause.

committee from within the industry to formulate a plan. The commission could then adopt the plan, after public hearings, if "the program was reasonably calculated to carry out the objectives of the Act." After one such program was adopted for the raisin industry, Parker sued Brown, State Director of Agriculture, to enjoin enforcement of the program, alleging that it violated the Sherman Act.

After stating, in the language already quoted, that the Sherman Act does not apply to the states, the Parker Court emphasized the legislature's involvement in the plan before concluding that the plan was not violative of the Sherman Act.[9] Thus, Shell argues that the state's immunity extends only to similar situations where the legislature has

mandated an alternative to competition as the *summum bonum* for an industry.[10]

A number of post-*Parker* cases seemingly enhance Shell's position by focusing on the legislative involvement in *Parker*.[11] They are best represented by the First Circuit in George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., *supra*, 424 F.2d at 30 (footnote omitted)[12]:

The [Parker] Court's emphasis on the extent of the state's involvement precludes the facile conclusion that action by any public official automatically confers exemption. As one commentator has observed, the assertion that an act is "valid governmental action * * * suggests inquiry rather than ends it. * * * Generally, the underlying issue in determining

---

9. For example:

[The marketing program] derived its authority and its efficacy *from the legislative command of the state* and was not intended to operate or become effective without that command.

(317 U.S. at 350, 63 S.Ct. at 313, emphasis added).

We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents *from activities directed by its legislature*.

*Id.* at 350–351, 63 S.Ct. at 313 (emphasis added).

The state itself exercises *its legislative authority* in making the regulation and in prescribing the conditions of its application.

*Id.* at 352, 63 S.Ct. at 314 (emphasis added).

10. Since we reject Shell's argument, we need not consider whether New Mexico's legislature has mandated anti-competitive purchases of asphalt to replace competition among inferior public bodies.

11. One set of such cases should be separated from the others at the outset. In Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court held that joint efforts to influence public officials in the passage of laws are beyond the scope of the antitrust laws. *Noerr* cited *Parker*, 365 U.S. at 137 n.17, 81 S.Ct. 523, and both *Parker* and *Noerr-Pennington* deal with what might be termed "state-action" immu-

nity. But by imputing the "legislative" limitation of *Noerr-Pennington* to *Parker*, Shell loses sight of the fact that they are two separate doctrines. *See, e. g.,* George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25 (1st Cir. 1970), where *Parker* and *Noerr-Pennington* immunity are discussed separately. The case before us has none of the elements of a *Noerr-Pennington* case, and the *Noerr-Pennington* doctrine is inapplicable.

12. *See also* Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 706, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962), "[*Parker*] sustained the validity of mandatory state or federal governmental regulations. . . ."; Consolidated Gas Electric Light & Power Co. of Baltimore v. Pennsylvania Water & Power, 194 F.2d 89, 99 (4th Cir. 1952), "[*Parker* involved] the right of the State of California to regulate and control the production of agricultural products within the state"; Morton v. National Dairy Products Corp., 287 F.Supp. 753, 763 (E.D. Pa.1968). "[*Parker* holds that] activity imposed by a state on sellers through legislation . . . is 'state activity' beyond the reach of the antitrust laws"; and North Little Rock Transportation Co., Inc. v. Casualty Reciprocal Exchange, 85 F.Supp. 961, 964 (E.D.Ark.1949), "The Sherman Act is not violated by acts authorized and regulated by state statute". In Wainwright v. National Dairy Products Corp., 304 F.Supp. 567 (N.D.Ga.1969), the Court found the existence of "state action" by finding: "In short, the state's hand ran throughout the statutory scheme" (*Id.* at 574).

the applicability of such an exemption is the degree of governmental involvement in, and supervision over, the allegedly wrongful private activity." Comment, Alabama Power Company v. Alabama Electric Cooperative, Inc., 55 Va.L.Rev. 325, 345–346 (1969). Our reading of *Parker* convinces us that valid government action confers antitrust immunity only when government determines that competition is not the *summum bonum* in a particular field and deliberately attempts to provide an alternate form of public regulation.

In terms of such deliberate governmental occupation of a field normally left to the free winds of competition, this case falls at the opposite end of the spectrum from *Parker*. At the *Parker* end of the spectrum lie cases like Trucking Unlimited v. California Motor Transport Co., 1967 Trade Cas., ¶ 72,298 (N.D.Cal. 1967), a case involving certification of common carriers, where the deliberate choice of a regulatory agency intervened between the private anti-competitive activity and the resulting restraint on trade, or cases like E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52 (1st Cir. 1966), cert. denied, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1967), a suit involving an airport service franchise, where a state agency exercised broad authority to manage a monopoly in the public interest. Even at this end of the spectrum, no exemption will be found if state encouragement of price stability falls short of the delegation and approval in *Parker*. *See* Schenley Indus., Inc. v. New Jersey Wine & Spirit Wholesalers Ass'n, 272 F. Supp. 872 (D.N.J. 1967); *cf.* United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 561–562, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944).

The middle of the spectrum is occupied by cases in which the state has chosen to regulate a field, but state policy is neutral or silent with respect to restraints of trade. Since there is no conflict in such cases between state regulatory action and the policy of unfettered competition, the courts have found no difficulty in denying antitrust immunity. Northern Securities Co. v. United States, 193 U.S. 197, 347–350, 24 S.Ct. 436, 48 L.Ed. 679 (1904), cited in Parker v. Brown, *supra,* at 317 U.S. 351, 63 S.Ct. 307, [87 L.Ed. 315]; Travelers Insurance Co. v. Blue Cross of Western Pennsylvania, 298 F.Supp. 1109 (W.D.Pa.1969); *cf.* Asheville Tobacco Board of Trade, Inc. v. FTC, 263 F.2d 502 (4th Cir. 1959).

But these cases involved suits against allegedly private defendants who defended on the basis that the state has authorized their anti-competitive conduct. The alleged authorization is normally either a putative regulatory scheme[13] or a state created corporation intended to manage a monopoly in the public interest.[14]

In either situation, it is necessary to determine whether the anti-competitive result actually is a goal of the state entitled to the state's immunity rather than a private group masquerading under the banner of "state action." Such a determination necessarily involves an inquiry into legislative motives, and courts are understandably reluctant to apply the state's immunity to private parties without a clear indication by the state's legislature that the anti-competitive results have its sanction.

But there is no indication from those cases that the legislature must declare its intent to supplant competition in an industry when there is no question that the conduct is committed by the

---

13. *See, e. g.,* Travelers Insurance Co. v. Blue Cross of Western Pennsylvania, 298 F.Supp. 1109 (W.D.Pa.1969).

14. *See, e. g.,* Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52 (1st

Cir.), cert. denied, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); Ladue Local Lines, Inc. v. Bi-State Development Agency of Missouri-Illinois Metropolitan District, 433 F.2d 131 (8th Cir. 1970).

state. Since the suit here is directly against the state, there can be no such question, and the *Whitten* analysis is inapplicable.[15] The "legislative mandate" test is useful, indeed possibly necessary, when there is doubt if the defendant or the regulatory scheme is really an instrument of the state. But when there is no doubt that the defendant is the state, the "legislative mandate" analysis is unnecessary.

■ This conclusion comports with the reliance in *Parker* upon a "legislative mandate". After declaring that the Sherman Act is inapplicable to states, the Court seemingly turned to the question whether the plan was really the act of the state, noting that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." From what follows in the Court's opinion, it appears that the Court was responding to the obvious point that since the Commission was comprised of industry leaders and the plan was formulated by industry representatives, the plan was nothing more than a private agreement disguised as state action. It was apparently to this obvious objection that the Court responded when it relied upon the legislative regulatory policy and the fact that the commissioners were gubernatorial appointees. Thus, the Court was merely relying on the legislative mandate to conclude that the plan was the product of the state; it did not conclude that state action is immune from antitrust liability only when directed by the legislature as part of an anti-competitive regulatory scheme.[16]

We have yet to consider in detail Hecht v. Pro-Football, Inc., *supra*. There, the District of Columbia Armory Board, a public body which operates Robert F. Kennedy Stadium, entered into a lease with a football team, the Washington Redskins, that prohibited the Armory Board from leasing the stadium to any other professional football team. The district court dismissed an antitrust suit against the parties to the lease, holding that the lease was a governmental act and, as such, exempt from the antitrust laws under Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The District of Columbia Circuit reversed and remanded.

The court disagreed with the conclusion that all governmental action is exempt from the antitrust laws:

The rationale of the trial court and the theory of the appellees in sustaining its decision set forth as "the execution of the * * * lease * * * constituted valid governmental action which is immune from application of the antitrust laws." In support of this appellees state, "The key, undisputed fact is that the Armory Board is a governmental agency." And we are cautioned not to "overlook the fact that, in leasing the Stadium, the Armory Board acted pursuant to an Act of Congress." In conclusion, after review of the pertinent authorities appellees deduce the "rule that where direct governmental action, as distinct from private conduct, has caused the alleged injury to a plaintiff, the provisions of the fed-

---

15. Nor can there be any valid argument that a county is really a private party masquerading under the umbrella of state authority.

16. Any other reading of *Parker* would make the "legislative mandate" discussion inconsistent with the earlier statement that the Sherman Act is inapplicable to the states.
   It is true that the defendant was clearly a state officer in *Parker*. But the plaintiff was not asserting that the Director of Agriculture was liable: he was arguing that the

Director could not enforce his regulations requiring admittedly private parties to act anti-competitively. It is far different to conclude that a state official, not acting under the mandate of a legislative regulatory scheme, can be enjoined from forcing private parties to act anti-competitively than to conclude that the official or the state for whom he acts is itself liable for a violation of the Sherman Act. The former is merely a Supremacy Clause question.

eral antitrust laws are inapplicable * * * " and "the action of the Armory Board in entering into the Stadium lease with the Redskins was a governmental act which is immune from application of the antitrust laws."

After a study of the rationale back of the decided cases in this area of antitrust law, we consider that the issue, the facts considered most relevant by appellees, and the rule derived by appellees is a much too talismanic approach where scrupulous distinctions are called for. As was said earlier this year by Judge Goldberg in Woods Exploration & Producing Co. Inc. v. Aluminum Co. of America, [438 F.2d 1286], "[t]he instant case involve[s] state participation. That proposition, however, only begins the analysis, for it is not every governmental act that points a path to an antitrust shelter. We reject 'the facile conclusion that action by any public official automatically confers exemption.' George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., * * * 1 Cir. 1970, 424 F.2d 25, 30." Like Circuit Judge Coffin in Paddock Pool, supra, "[w]e are particularly reluctant to rely on verbal formulae to solve problems of antitrust liability."

444 F.2d at 934–935 (footnotes omitted).

The significant point of Hecht is that the court, for the first time, drew the "scrupulous distinctions" not to determine whether the Board was actually a private party, but rather to determine whether an admittedly governmental body fell within the scope of antitrust laws. The case is distinguishable on the ground that the governmental body was a federal rather than state entity.[17] However, the court did not limit its reasoning to cases involving federal action, and it relied heavily on cases, such as Parker, involving state action. The implication of the court's language and approach is that states are not always immune[18] from antitrust liability.

Our conclusion that a state (once found indeed to be a state) is not covered by sections 1 and 2 of the Sherman Act is inconsistent with the rationale of Hecht. We can do no more than say that, for the reasons already discussed, we disagree with the implication of Hecht that a state may sometimes be liable.

A final point raised by Shell must be considered. It argues that states engage in numerous "business activities" that are similar to the conduct of private parties. The state acting as a consumer, as in this case, is a common example. Shell argues that when states act like private businesses or as consumers they should be treated as such under the antitrust laws. This may be true, but it is a matter for Congress to decide. The basis (grounded in federalism) for our conclusion that Congress did not intend the Sherman Act to apply to the states does not vary in strength depending on the specific activity in which the state

17. This distinction is not without significance, since the federalism obstacles to state antitrust liability discussed above are inapplicable. The central issue in Hecht was whether Congress, in granting authority to the Armory Board to operate Robert F. Kennedy Stadium, authorized a mode of operation inconsistent with the antitrust laws. See 444 F.2d at 935, 938, 942–947. Since Congress had enacted both the antitrust laws and the legislation concerning the stadium, and since the former preceded the latter both chronologically and in order of national importance, the court began with the premise that the antitrust laws applied to the operation of the stadium absent "a definite clearly expressed, specific intent of Congress" to the contrary. Id. at 947. A different premise underlies the question of the applicability of the antitrust laws to state action. As stated in Parker, "[i]n a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." 317 U.S. at 351, 63 S.Ct. at 313.

18. The issue is more properly framed as one involving the applicability of the Sherman Act to the states rather than a state's immunity from the Act.

engages. Therefore, we have no basis for concluding that Congress intended sections 1 and 2 of the Sherman Act to apply to some activities of the state but not to others.

We conclude that a state cannot be sued for alleged violations of sections 1 and 2 of the Sherman Act.[19] The order of the district court dismissing Shell's counterclaim is affirmed, and the case is remanded for further proceedings.

19. We note that we are faced only with an antitrust claim directly against the state. We express no opinion on the liability of private parties who conspire with a state in restraint of trade. Nor do we imply that a state cannot be enjoined from forcing private parties to violate the antitrust laws where the requirements of *Parker* are not met.

In addition, we express no view concerning the circumstances in which state agents, officers, and employees acting in their official capacities are subject to the Sherman Act. *Cf., e. g.,* Rangen, Inc. v. Sterling Nelson & Sons, 351 F.2d 851, 858–859 (9th Cir. 1965).

Since we have concluded that states are not regulated by sections 1 and 2 of the Sherman Act, we need not consider whether sections 4 and 16 of the Clayton Act afford Shell the remedies it seeks.