**DEAK–PERERA HAWAII, INC., a Hawaii corporation, Plaintiff,**

v.

**DEPARTMENT OF TRANSPORTATION, STATE OF HAWAII; Ryokichi Higashionna, in his official capacity as the Director of the Department of Transportation for the State of Hawaii; Owen Miyamoto, in his official capacity as Chief of the Airport Division of the Department of Transportation of the State of Hawaii, Defendants,**

and

**Citicorp (U.S.A.), Inc., Intervenor.**

Civ. No. 82–0334.

United States District Court, D. Hawaii.

Jan. 3, 1983.

As Amended March 7, 1983.

Don Gelber and Stephen Gelber, Gelber & Wagner; Wayne Pitluck and Robert Miller, Honolulu, Hawaii, for plaintiff.

Tany S. Hong, Atty. Gen. of Hawaii, Randall Young, Honolulu, Hawaii, for defendants.

Robert A. Rowan, Terry Day, Susan Mollway, Cades Schutte Fleming & Wright, Honolulu, Hawaii, for intervener.

## DECISION

PENCE, Senior District Judge.

This matter came before the court on cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The arguments were heard on September 1, 1982.

The motions sought to determine the legal issues of whether or not defendants, the State of Hawaii's Department of Transportation, its director Ryokichi Higashionna and Airport Chief Owin Miyamoto (collectively the DOT), were entitled to "state-action immunity" under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), or were entitled to Eleventh Amendment immunity; or whether plaintiff, Deak-Perera Hawaii, Inc. ("Deak") was entitled to a permanent injunction and judgments as to violations of state and federal antitrust statutes.

An order was entered on September 2, 1982, granting defendants' motion on the basis of *Parker v. Brown* immunity and denying plaintiff's motion.[1] For the reasons herein given, it was unnecessary for the court to reach the Eleventh Amendment issue or the alleged violation of state and federal antitrust statutes.

---

1. Order Granting and Denying Motions for Summary Judgment was amended on September 3, 1982, to accelerate dissolving the temporary restraining order when Deak abandoned the premises earlier than expected. The order was further amended by order filed December 1, 1982, after a hearing on plaintiff's motion to alter the previous orders concerning payment of rents due to State.

## FACTUAL BACKGROUND

Hawaii, as an island state, has always been especially dependent upon ships and, more recently, planes for inter-island and mainland communication and transportation.[2] Even before commercial aviation came to the islands, the Territorial legislature had appropriated funds for what has become today the state's commercial airport system for each and all of the Hawaiian islands.[3]

The importance of the airport system is further emphasized by the expansion of tourism as a mainstay of the State economy.[4] The nearly four million tourists coming to Hawaii each year from the continental United States, Canada, Japan, Australia, and literally all parts of the globe, depend almost entirely upon the availability of efficient and dependable airport facilities.[5] The development, management, and financing of the airport system is governed by an enabling Act of the Hawaiian Legislature.[6] In effect, the support of this airport system, under the Legislative mandate, must be met by the Airport Revenue Fund. This is made up of rents, concessions, aircraft landing fees, and the aviation fuel tax. For the last few years, the concession fees have provided the lion's share of the Fund's revenues.[7]

The concession activities at Honolulu International Airport (HIA) encompass the full range of facilities one might find at a large airport. At HIA, the duty-free concession is the largest revenue producer.[8] Other concessions include bars, restaurants, and snack bars; newsstands, fruit and packaged-food stands; barber shop, shoeshine stand, telegrams and flight insurance, and the parking lot.[9] Also, the Bank of Hawaii maintains a branch at HIA.[10]

Most of these concessions are "exclusive", including the ground transportation for rent-a-car, airport shuttle bus, and airport taxi.[11] The lei stands are about the only "non-exclusive" concessions at HIA.[12]

For the past twenty years, Deak has operated foreign exchange concessions at HIA. For the last ten years, Deak has enjoyed exclusive contracts between itself and the Department of Transportation for the HIA foreign exchange concession.[13] In

2. Horvat, *Above the Pacific* (1966) at 63. Commercial aviation did not begin until 1929. *See* Hawaiian Aeronautics Commission, *First Annual Report,* 1947–48 (1948) at 10.

3. Act 176, Session Laws of Hawaii 1925. *See* n. 2, *supra.*

4. Besides tourism, the other three largest revenue sources for the state are federal government defense spending, sugar, and pineapple growing. Respectfully, the four sources, in 1980, earned: $3.0 billion for tourism; $1.3 billion for defense spending; $594 million for sugar production; and $233 million for pineapple. *See The State of Hawaii Data Book* (1981) at 173.

5. *See generally Hawaii Business* (Jan.1982); *Hawaii Business* (Mar.1982); and *Hawaii Business* (July 1982).

6. Haw.Rev.Stat. Ch. 261 (Supp.1981). *See* nn. 32–35, 44, 45, and 48, *infra.*

7. In fiscal year 1981, the concession fees amounted to 76% of operating revenues. *See DOT Annual Report* (1982) at 30.

8. *See Defendant State of Hawaii's Pre-Trial Brief,* filed Aug. 20, 1982, at 7.

9. *Ibid.*

10. Bank of Hawaii, Airport Branch, also provides some limited foreign currency exchange. However, the amount may be considered as *de minimus* relative to the whole market at HIA.

11. Each of the "exclusive" ground transportation contracts at HIA is involved in an antitrust suit: Civ. No. 79–0146, *Pacific Auto Rental Corp. dba Dollar Rent-A-Car Systems v. State of Hawaii, et al.,* filed April 2, 1979; Civ. No. 79–0383, *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc., et al.,* filed August 31, 1979; and Civ. No. 80–0060, *Charley's Tour & Transportation, Inc. v. Interisland Resorts, Ltd., et al.,* filed February 2, 1980. The *Pacific Auto* case has been consolidated in M.D.L. No. 338, *Airport Car Rental Antitrust Litigation* and is assigned to District Judge William W. Schwarzer in the Northern District of California.

12. *See* n. 8, *supra.*

13. Deak was the "sole bidder" in both 1972 and 1977 for five-year exclusive contracts. Three bids were received by June 17, 1982, for the exclusive five-year contract to commence July 1st. At the opening it appeared Citicorp (USA), Inc. was the high bidder at $1.25 million

the 1982 bids, Deak lost the bid to Citicorp (USA), Inc.,[14] which bid almost two and one-half (2½) times as much as Deak for the five-year exclusive concession.

The foreign exchange concession at HIA consists of five physical locations. Only one of these locations is sufficiently large enough for office space and a secure area, as well as a counter; all others are merely counter space.[15] Deak has also maintained a sixth location at the Japan Airlines lounge servicing passengers under a private contractual agreement with that airline.[16]

DECISION

The gravamen of plaintiff's action is that defendants have violated federal antitrust law by the issuance of an exclusive lease for the foreign exchange concession at HIA.[17] Defendants have responded that they are shielded from such a suit under the *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), state-action immunity doctrine. For the DOT to have state-action immunity in its grant of the exclusive concession here in question, it must either show that (1) it is an agent or instrumentality of the state acting as sovereign and as such is entitled to state-action immunity; or (2) as

an independent political subdivision, it meets the criteria of the *California Retail Liquor Dealers' Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) two-prong analysis (the *Midcal* Test), viz: a clearly articulated and affirmatively expressed state policy with adequate review and supervision by the state.

PART I: *PARKER v. BROWN* STATE-ACTION IMMUNITY

Here, as in all decisions on claims of state-action immunity, the perimeters of state-action immunity as defined in *Parker v. Brown* and refined in its progeny must be clearly understood.[18] Actually, it is a misconception to say that the state-action doctrine was "defined" in *Parker v. Brown,* the doctrine has always existed in our federalist system, and *Parker v. Brown* merely restated and applied that doctrine to the antitrust laws:

In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and

for the five years. Deak was second high bidder at $505,000 for the same period. Deak immediately filed the present action.

14. Citicorp (USA), Inc. is a Delaware corporation and a subsidiary of Citibank International. Citibank International originally attempted to intervene. Such was denied after a finding that Citicorp (USA), Inc. was the proper party in interest. Eventually, Citicorp (USA), Inc. did intervene in its own right and has submitted briefs and argued to this court on behalf of the state's motions.

15. The locations are designated as Space No. 346–118 comprising counter area of 121 square feet; Space No. 346–111A comprising counter area of 196 square feet; Space No. 344–237 comprising counter area of 25 square feet; Space No. 344–210 comprising counter space of 68 square feet (soon to be replaced by Space No. 344–222A under construction); and Space No. 342–262 comprising counter and office area of 690 square feet.

16. This was apparently a portable booth arrangement used only for the "package tour" groups arriving on Japan Airlines.

17. The antitrust claims are brought under both the Sherman Act, 15 U.S.C. §§ 1 & 2; and the

Clayton Act, 15 U.S.C. § 16. Plaintiff also alleges violations of state antitrust laws and violations of state bidding procedures. The latter count, on bidding procedures, has been dismissed by a previous order (Order Granting Intervenor's Motions for Dismissal of Count V and for Protective Order, filed September 2, 1982). The other counts need not be reached unless plaintiff hurdles the defenses to the alleged Sherman Act violations.

18. *Community Communications Co., Inc. v. City of Boulder, Colorado,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); *California Retail Liquor Dealers' Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), reh. *denied* 423 U.S. 886, 96 S.Ct. 162, 46 L.Ed.2d 118 (1975), and *New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978) to cite but a few.

agents is not lightly to be attributed to Congress.

317 U.S. at 351, 63 S.Ct. at 313.

The United States Supreme Court has not decided a state-action case based on the state acting as sovereign since *Parker*.[19] In the *Parker* decision, Mr. Chief Justice Stone approvingly cited *Lowenstein v. Evans*, 69 F. 908 (C.C.D.S.C.1895),[20] which held that South Carolina's regulation of the liquor trade was the act of a state as sovereign. The fact that the law was administered by certain state agents did not create a monopoly for and in those individuals and thus preclude immunity from the federal antitrust laws.[21]

In *Parker*, the Court had to decide the further question of whether state-action immunity could be extended to give protection to "private" individuals—the raisin growers. To that end, the Court examined the state's involvement in the regulation of raisin price setting. The Court determined that the state involvement was sufficient since the regulation was mandated by state law; the recommended prices were reviewed by the state commission; and the final decision rested with the state acting through the State Agriculture Proration Advisory Commission. 317 U.S. at 346–350, 63 S.Ct. at 311–13.

In short, the *Parker* Court found that the raisin prorate program derived its authority from the legislative command of the state and was not designed to create a monopoly by force of individual agreement or combination. The Court concludes that:

We find nothing in the language of the Sherman Act or its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature.

317 U.S. at 350–351, 63 S.Ct. at 313.

The Court noted that while a state may be considered a "person" for purposes of suing under the antitrust laws, the State of California was not in that category of "persons" that the Sherman Act intended to restrain. 317 U.S. at 351, 63 S.Ct. at 313, (citing *Georgia v. Evans*, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (1942)).

*Parker v. Brown,* and most of its progeny, have never denied nor even suggested that Congress intended to subject states, as sovereigns, to federal antitrust laws. Rather, all have denied immunity to "private parties" or "political subdivisions" seeking to cloak their alleged monopolistic actions under the "gauzy cloak of state involvement".[22] In each recent case before the Supreme Court, the question has been whether some entity other than the state may claim state-action immunity. None of those cases has held that a state acting in its sovereign capacity should be denied immunity from federal antitrust laws.

All of those decisions are perfectly consistent with our federalist system and the purpose of the federal antitrust laws viz., to protect the public from unreasonable interference with competition in interstate and foreign commerce. Where private parties are attempting to monopolize an area of trade, the public has every right to expect protection; with governmental bodies, the

**19.** 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). *See also* n. 18. All of these cases address the extension of state-action immunity to persons or corporations claiming immunity under state authority. None of the cases suggest that the state is acting as sovereign and that such action is being questioned.

**20.** Chief Justice Stone cited *Lowenstein* to compare it with *Olsen v. Smith,* 195 U.S. 332, 25 S.Ct. 52, 49 L.Ed. 224 (1904). *Olsen* held that a state may regulate pilotage, even though such regulates commerce, until such time as federal laws should override or preempt the area. The comparison was that in *Lowenstein* the lower court had held that a state was neither a "person" nor a "corporation" within the

meaning of the Act of Congress dealing with monopolies and trusts. Therefore, the South Carolina law regulating the liquor trade was a state monopoly enforced by the governor, secretary of state, and controller. The law did not create a monopoly in those individuals; rather, they were mere instrumentalities of the state acting as and for the state. As such, the monopoly was immune from antitrust prosecution as an action of the state as sovereign.

**21.** *Ibid.*

**22.** *See generally* n. 18, *supra. See specifically Midcal,* 445 U.S. at 106, 100 S.Ct. at 943.

people have a more direct recourse—the vote.

While federal laws can override state laws which are inconsistent with national law,[23] the Sherman Act has not been interpreted to override all state laws which impinge on competition. In the latter situation, when it is not clear the state is acting as a sovereign, the crucial questions are whether there has been a "clearly articulated and affirmatively expressed" state policy, and if that policy is being "actively supervised" by the state. *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943 (quoting *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389 at 410, 98 S.Ct. 1123 at 1135, 55 L.Ed.2d 364).[24] The *Midcal* test was neither new nor unexpected when applied to *"private* individuals" seeking state-action immunity,[25] but the application of the *Midcal* test to *"public* officials, agencies and treasuries" has created substantial confusion and apprehension both in the courts and in public officials generally.[26]

■ Nevertheless, even after *Lafayette* and *Midcal,* and even after *Community Communications Co., Inc. v. City of Boulder, Colorado,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), it is still clear that a state, acting as sovereign, is immune from federal antitrust laws unless such laws are overridden by specific national laws.[27] Therefore, this court must initially determine whether or not the DOT was acting as "the state" or as some independent "political subdivision". If DOT acted "as the

state", then obviously it can be afforded state-action immunity; if it was acting independently and was merely seeking to protect itself under some "gauzy cloak of state involvement", then the court must continue on to the *Midcal* test.

The cases of *E.W. Wiggins Airways, Inc. v. Massachusetts Port Authority,* 362 F.2d 52 (1st Cir.1966), and *New Mexico v. American Petrofina, Inc.,* 501 F.2d 363 (9th Cir. 1974), underscore the need for this court to examine the threshold question of whether or not the challenged acts are done by the state in its sovereign capacity, before considering a secondary examination under *Midcal.*

*Wiggins* dealt with the authority of the Massachusetts Port Authority (MPA) to enter into exclusive contracts in the operation of Logan and Butler-Boston Airports. The court held that the MPA was an "instrumentality or agency" of the Commonwealth of Massachusetts and, as such, was acting in an official capacity for and as the state. 362 F.2d at 55–56. In essence, the court found the MPA was acting for the state in the exercise of a valid state governmental function and, therefore, was entitled to state-action immunity under *Parker. Id.* at 55.

In *Petrofina,* the State of New Mexico brought suit for alleged antitrust violations by various asphalt suppliers. The defendants counterclaimed that the · state and some of its political subdivisions had con-

---

**23.** Cf. *Bates v. State Bar,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) and *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). *See also Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

**24.** Actually one may argue that this test was applied in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In that case, the court sought to determine whether or not the state was the controlling force behind the raisin subsidy. In effect, the court was looking for adequate state authority to fix the price and sufficient state involvement in review of the price set by the private raisin growers. Chief Justice Stone did so find.

**25.** See *Goldfarb,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Cantor,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); and *Bates*

*v. State Bar,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977).

**26.** Areeda, *Antitrust Immunity for "State Action" After Lafayette,* 95 Harv.L.Rev. 435, 438–439. *See also Lafayette,* 435 U.S. at 440–441 and 441 n. 32, 98 S.Ct. at 1150 and 1151 n. 32 (dissenting opinion of Stevens, J.).

**27.** *See* nn. 18 and 23, *supra.* An examination of these cases indicates none dealt with a state acting as sovereign. Rather, all concerned attempts by private individuals or independent political subdivisions seeking immunity for their actions under the "gauzy cloak of state involvement."

spired in violation of the Sherman Act. After discussing the meaning of the word "person" in the Sherman Act,[28] and examining the purpose of the Sherman Act in relation to the acts of a state as sovereign, the court stated:

> Since the suit here is directly against the state, there can be no such question [as to whether or not the conduct was committed by the state], and the *Whitten* [*George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25, 30 (1st Cir.1970)][29] analysis is inapplicable. [Footnote omitted.] The "legislative mandate" test is useful, indeed possibly necessary, when there is doubt if the defendant or the regulatory scheme is really an instrument of the state. But when there is no doubt that the defendant is the state, the "legislative mandate" analysis is unnecessary.

501 F.2d at 370.

More recent Ninth Circuit cases and the United States Supreme Court cases since 1974 have indicated that there now is even more than a "valid argument" against "automatically" giving counties and cities state-action immunity.[30] Such political subdivisions may be subjected to the *Midcal* analysis. However, nothing since *Petrofina* has eroded its central theme that when it is the state itself being sued or acting, then it is entitled to *Parker* immunity against the Sherman Act and the *Midcal* analysis is "unnecessary".[31]

■ The DOT is legally an instrumentality of the State of Hawaii. It is clearly to be distinguished from an independent "political subdivision" of a state, such as a city or county and their administrative instrumentalities. Obviously, the latter fall under the *Lafayette-Midcal* rubric and would be subject to *Midcal*'s additional two-prong test. For the purposes of this case, it is manifest that the DOT has been delegated the responsibility for the construction, operation and maintenance of all the state-operated commercial airports in Hawaii.[32] The oper-

**28.** The appellate court distinguished the definition of "person" in *Georgia v. Evans,* 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (1942) as permitting a state to bring suit as a "person" under the Sherman Act with the definition in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) as not permitting a state to be sued as a "person" under the same act.

**29.** The *Whitten* test was a precursor to the *Midcal* analysis of whether or not there has been a "clearly articulated and affirmatively expressed" state policy and, if so, whether it was being "actively supervised" by the state. In the omitted footnote in *Petrofina,* the court opined that there could not be any valid argument that a county was a private party masquerading under the umbrella of state authority. 501 F.2d at 370, n. 15.

**30.** *Ronwin v. State Bar of Arizona,* 686 F.2d 692 (9th Cir.1982) (amended opinion) citing *Lafayette,* 435 U.S. at 408; and *City of Boulder,* 455 U.S. 40, 102 S.Ct. at 842, state that the Court has rejected such automatic extension of *Parker* immunity to government entities "simply by reason of their status as such." *See also, Benson v. Arizona State Board of Dental Examiners,* 673 F.2d 272 (9th Cir. March 29, 1982); *Miller v. Oregon Liquor Control Commission,* 688 F.2d 1222 (9th Cir.1982); and *Knudsen v. Nevada State Dairy Commission,* 676 F.2d 374 (9th Cir.1982).

Because of the rather unclear and incorrect analysis as to what sort of "government entities" might require *Midcal* analysis other than a "state commission, state board, and a state department" mentioned in *Ronwin,* this court has performed a *Midcal* analysis for this case, *infra,* Part II.

**31.** As has been suggested earlier, *Parker,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and all of its progeny, including *City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), have dealt only with political subdivisions seeking to assume the immunity granted to a state as sovereign. None of the United States Supreme Court decisions hold or suggest that the *states* acting as sovereigns through their officers and agents are to be denied state-action immunity. The section on *Midcal* analysis as applied to the present case, *infra,* demonstrates why such a holding would be logically superfluous.

**32.** Haw. Const. Art. V, § 6 provides for not more than twenty principal departments under the supervision of the governor. Haw. Rev. Stat. Ch. 26 creates seventeen executive departments; Haw. Rev. Stat. § 26–19 provides for a department of transportation, headed by a director, which "shall establish, maintain, and operate transportation facilities of the State, including highways, airports, harbors. . . ." Haw. Rev. Stat. § 261–4:

> § 261–4 *Airports, general.* (a) Establishment, operation, maintenance. The department of transportation may on behalf of and in the name of the State, out of appropriations and other moneys available or made available for such purposes, plan, acquire,

ations of the state's airports are expressly recognized as "public and governmental functions, exercised for a public purpose, and matters of public necessity."[33] Under

and establish, construct, enlarge, and improve in the manner herein provided, maintain, equip, operate, regulate, and protect, airports and air navigation facilities, including the construction, installation, equipment, maintenance, and operation at airports of buildings and other facilities for the servicing of aircraft or for the comfort, accommodation, and convenience of air travelers, and including protection against airport hazards. For such purposes the department may, by purchase, gift, devise, lease, condemnation in accordance with chapter 101, or otherwise, acquire property, real or personal, or any interest therein, including the property, rights, estates, and interests mentioned in section 262–11. The department may acquire rights and interests in airports owned or controlled by others, for the purpose of meeting a civilian need which is within the scope of its functions, even though it does not have the exclusive control and operation of such airports. No officer, board, or department of the State, or municipality, shall perform any function which is within the jurisdiction of the department without its approval, except for military purposes.

(b) Acquisition of real property. In the acquisition of real property and interests therein, the department of accounting and general services shall assist the department of transportation at its request, and assign thereto state officers and employees under its supervision for the making of surveys, abstracts, and otherwise as may be of assistance, for which services the department of transportation shall pay out of the appropriations available to it, unless the department of accounting and general services has a general fund appropriation for such services.

(c) Structures and improvements. All structures and improvements to land shall be initiated by the department of transportation and shall be constructed or made by or under the comptroller, in conformity with plans and specifications approved by the department of transportation, for which purpose the department of transportation shall make allotments of the funds under its control for expenditure by the comptroller and for services of the department of accounting and general services for which the department has no general fund appropriation.

(d) Use of state and municipal facilities and services. In carrying out this chapter, the department of transportation may use the facilities and services of other agencies of the State and of the municipalities of the State to the utmost extent possible, and the agencies and municipalities shall make available their facilities and services. This subsection shall apply to the department of accounting and

other sections of Hawaii Revised Statutes, the DOT is authorized to enter into contracts to provide for goods and services at the airports,[34] and is required to "generate

general services with respect to services and facilities in addition to those specified by subsections (b) and (c). [L 1947, c 32, pt of § 1; RL 1955, § 15–9; am L Sp 1959 2d, c 1, §§ 12, 26]

**33.** Haw.Rev.Stat. § 261–11:

§ 261–11 *Public purpose of activities.* The acquisition of any lands or interests therein pursuant to this chapter, the planning, acquisition, establishment, construction, improvement, maintenance, equipment, and operation of airports and air navigation facilities; and the exercise of any other powers granted by this chapter to the department of transportation are declared to be public and governmental functions, exercised for a public purpose, and matters of public necessity. All lands and other property and privileges acquired and used by or on behalf of the State in the manner and for the purposes enumerated in this chapter shall and are declared to be acquired and used for public and governmental purposes and as a matter of public necessity. [L 1947, c 32, pt of § 1; RL 1955, § 15–17; am L Sp 1959 2d, c 1, § 26]

**34.** Haw.Rev.Stat. § 261–7:

§ 261–7 *Operation and use privileges.* (a) Under department operation. In operating an airport or air navigation facility owned or controlled by the department of transportation, or in which it has a right or interest, the department may enter into contracts, leases, licenses, and other arrangements with any person:

(1) Granting the privilege of using or improving the airport or air navigation facility or any portion or facility thereof or space therein for commercial purposes;

(2) Conferring the privilege of supplying goods, commodities, things, services, or facilities at the airport or air navigation facility;

(3) Making available services, facilities, goods, commodities, or other things to be furnished by the department or its agents at the airport or air navigation facility; or

(4) Granting the use and occupancy on a temporary basis by license or otherwise any portion of the land under its jurisdiction which for the time being may not be required by the department so that it may put the area to economic use and thereby derive revenue therefrom.

All the arrangements shall contain a clause that the land may be repossessed by the department when needed for aeronautics purposes upon giving the tenant temporarily occupying the same not less than thirty days' notice in writing of intention to repossess.

Except as otherwise provided in this section, in each case mentioned in paragraphs (1), (2), (3) and (4), the department may es-

sufficient revenues from its airport properties to meet all of the expenditures of the statewide system of airports." [35]

tablish the terms and conditions of the contract, lease, license, or other arrangement, and may fix the charges, rentals, or fees for the privileges, services, or things granted, conferred, or made available, for the purpose of meeting the expenditures of the statewide system of airports set forth in section 261–5(a), which includes expenditures for capital improvement projects approved by the legislature. Such charges shall be reasonable and uniform for the same class of privilege, service, or thing.

The department shall enter into separate contracts with no more than two persons ("contractors") for the sale and delivery of in-bond merchandise at Honolulu International Airport, in the manner provided by law. Each such contract shall confer the right to operate and maintain commercial facilities within the airport for the sale of in-bond merchandise and the right to deliver to the airport in-bond merchandise for sale to departing foreign-bound passengers.

The department shall grant such contracts pursuant to the laws of this State and may take into consideration:

(1) The payments to be made on in-bond merchandise sold at Honolulu International Airport and on in-bond merchandise displayed or sold elsewhere in the State and delivered to the airport;

(2) The ability of the applicant to comply with all federal and state rules and regulations concerning the sale and delivery of in-bond merchandise; and

(3) The reputation, experience, and financial capability of the applicant.

The department shall actively supervise the operation of the contractors to insure its effectiveness. The department shall develop and implement such guidelines as it may find necessary and proper to actively supervise the operations of such contractors, and shall include guidelines relating to the department's review of the reasonableness of contractors' price schedules, quality of merchandise, merchandise assortment, operations, and service to customers.

Apart from the contracts described above, during the period ending June 30, 1982, the department shall confer no right upon any person to offer to sell, sell, or deliver in-bond merchandise at Honolulu International Airport.

(b) Under other operation. The department may, by contract, lease, or other arrangement, upon a consideration fixed by it, grant to any qualified person the privilege of operating, as agent of the State or otherwise, any airport owned or controlled by the department; provided that no such person shall be granted any authority to operate the airport other than as a public airport or to enter into any contracts, leases, or other arrange-

The function of the airport system in Hawaii must be viewed as a fundamental government function. [36] Much as schools,

ments in connection with the operation of the airport which the department might not have undertaken under subsection (a) of this section.

(c) Miscellaneous fees and charges. The department may fix and regulate, from time to time, reasonable landing fees for aircraft and other reasonable charges for the use and enjoyment of the airports and the services and facilities furnished by the department in connection therewith, including the establishment of a statewide landing fee which may vary among different classes of users such as foreign carriers, domestic carriers, inter-island carriers, air taxi operators and such other classes as may be determined by the director of transportation, for the purpose of meeting the expenditures of the statewide system of airports set forth in section 261–5(a), which includes expenditures for capital improvement projects approved by the legislature.

(d) Liens. To enforce the payment of any charges for repairs or improvements to, or storage or care of any personal property made or furnished by the department or its agent in connection with the operation of an airport or air navigation facility owned or operated by the department, the department shall have liens on the property, which shall be enforceable by it as provided by sections 507–18 to 507–22.

(e) Buildings and land areas for general aviation activities; developmental rates. The department may from time to time establish developmental rates for buildings and land areas used exclusively for general aviation activities at rates not less than fifty per cent of the fair market rentals of the buildings and land areas and may restrict the extent of buildings and land areas to be utilized. [L 1947, c 32, pt of § 1; am L 1949, c 374, § 1; am L 1953, JR 14, § 1; RL 1955, § 15–12; am L Sp 1959 2d, c 1, § 26; am L 1962, c 24, §§ 4, 5; HRS § 261–7; am L 1968, c 20, §§ 3, 4; am L 1972, c 14, § 1; am L 1976, c 235, § 2; am L 1981, c 243, § 2]

**35.** Haw.Rev.Stat. § 261–5:

§ 261–5 *Disposition of airport revenue fund.* (a) All moneys received by the department of transportation from rents, fees and other charges pursuant to this chapter as well as all aviation fuel taxes paid pursuant to section 243–4(a)(2) shall be paid into the airport revenue fund created by section 248–8. All such moneys paid into the airport revenue fund shall be expended by the department for the statewide system of airports, including the construction of airports and air navigation facilities approved by the legislature, including acquisition of real prop-

police services, and fire protection, the airport system is vital to the State of Hawaii from both functional and economic points of view.[37] As such, actions taken to manage and develop the airport system must initially be viewed as acts of the state in its sovereign capacity for the public good. Under these circumstances, a court must be most cautious about attempting to impose a hindrance or unnecessary burden upon the public officials in the execution of this public duty.[38]

The DOT, therefore, acts as the state in matters concerning the management of HIA. The DOT, as an instrumentality of the state, has full power to enter into contracts for concessions at HIA, even though monopolistic in nature, to fulfill its mandate to generate sufficient funds to support the statewide airport system. In all of this, the DOT is authorized and required to act and to act in the name of the State of Hawaii. This court can only conclude, therefore, that when the DOT acts, it is the same, in full part and parcel, as if the State of Hawaii were acting. Therefore, the actions of the DOT, whether they concern contracts or management of Hawaii's airport system, are entitled to state-action immunity as the acts of the State of Hawaii as sovereign.

PART II: THE *MIDCAL* ANALYSIS

■ Were it not for what Judge Ferguson, in dissent, in *Ronwin v. State Bar of*

*Arizona,* 686 F.2d 692 (9th Cir.1982), characterized as the application of "erroneous standards"[39] by the majority in determining whether the state agency there in question was exempt from antitrust laws, this court would not feel *compelled* to apply the *Midcal* analysis to this case. However, while this court agrees with Judge Ferguson that "[t]he majority incorrectly applies a test of compulsion by asking whether the action of the Committee [on Examinations and Admissions] was *required* by the state supreme court" (emphasis in original), thereby applying a *Midcal* analysis to "public" as well as "private" conduct, such an analysis has been made. Having made the analysis, this court finds that even if it were assumed that the DOT is merely a "political subdivision" of the state, there is ample authority from and supervision by the state to satisfy the *Midcal* test.

The *Midcal* case dealt with the necessity of filing fair trade contracts or price schedules with the State of California. *California Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 99, 100 S.Ct. 937, 940, 63 L.Ed.2d 233 (1980). Wholesalers had to post a resale price schedule and no state-licensed wine merchant could sell wine to a retailer at other than the posted effective price. Midcal Aluminum, Inc., a southern California distributor of wine, challenged the wine pricing system as a restraint on trade in violation of the Sherman Act.

erty and interests therein; and for operation and maintenance of airports and air navigation facilities; and for the payment of indebtedness heretofore or hereafter incurred by the department, or its predecessor, the Hawaii aeronautics commission, for any of the purposes of this chapter. The department shall generate sufficient revenues from its airport properties to meet all of the expenditures of the statewide system of airports and to comply with section 39–59; provided that as long as sufficient revenues are generated to meet such expenditures, the director of transportation may, in his discretion, grant a rebate of the aviation fuel taxes paid into the airport revenue fund during a fiscal year pursuant to sections 243–4(a)(2) and 248–8 to any person who has paid airport use charges or landing fees during such fiscal year. Such rebate may be granted during the next succeeding fiscal year but shall not exceed one-

half cent per gallon per person, and shall be computed on the total number of gallons for which the tax was paid by such person, for such fiscal year.

(b) All expenditures by the department shall be made on vouchers duly approved by the director of transportation or such other officer as may be designated by the director. [L 1947, c 32, pt of § 1; RL 1955, § 15–10; am L Sp 1959 2d, c 1, § 26; am L 1962, c 24, §§ 2, 3; HRS § 261–5; am L 1968, c 20, § 2; am L 1969, c 10, § 6 and c 99, § 1]

**36.** *See* n. 33, *supra.*

**37.** *See* nn. 1–5, *supra.*

**38.** *See* n. 26, *supra.*

**39.** *Ronwin v. State Bar of Arizona,* 686 F.2d 692 (9th Cir.1982).

The *Midcal* Court initially noted, in its review of the state court's decision, that "[t]he State [had] no direct control over wine prices, and it [did] not review the reasonableness of the prices set by the wine dealers." *Midcal,* 445 U.S. at 100, 100 S.Ct. at 940.[40] The Court then continued on to decide whether or not *Parker* immunity should apply absent direct control of an activity which appeared to violate the policies of the Sherman Act. *Id.* at 103–104, 100 S.Ct. at 942.

Reviewing its recent cases,[41] the *Midcal* Court outlined the analysis which must be followed where it is not evident at the threshold that the state is exercising direct control as a sovereign over the activity. The analysis was first stated in *Lafayette,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), and consists of a two-prong test:

First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the state itself. *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410 [98 S.Ct. 1123, 1135, 55 L.Ed.2d 364] (1978) (opinion of Brennan, J.). [Footnote omitted.]

445 U.S. at 105, 100 S.Ct. at 943.

Examining the legislative enactment to determine if it satisfied the first prong, the Court held that it did forthrightly state a clear purpose to mandate resale price maintenance. *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943. However, the Court found that the program failed to satisfy the second prong—the state failed to regulate prices or monitor market conditions or engage in any "pointed re-examination" of the program. *Id.* at 105–106, 100 S.Ct. at 943. The Court then stated that *Parker* teaches " 'a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful . . . .' 317 U.S. at 351 [63 S.Ct. at 313]." *Id.* at 106, 100 S.Ct. at 943. The question in *Midcal* concerned the state's participation in and control of the legislatively authorized activity violating the Sherman Act.

In this case, the state authorization for the DOT's action on the concession contracts at HIA can be found in the Hawaii Revised Statutes under Title 15—Transportation and Utilities, Chapter 261 Aeronautics. Section 261–4(a) directs the DOT to

maintain, equip, operate, regulate, and protect, airports and air navigation facilities, including . . . maintenance, and operation at airports of buildings and other facilities . . . for the comfort, accommodation, and convenience of air travelers . . . .[42]

To these ends, § 261–7 permits the DOT to

**40.** *Cf. Lowenstein v. Evans,* 69 F. 908 (C.C.D. S.C.1895). In *Lowenstein,* a state also sought to control the liquor trade. However, South Carolina exercised direct control and management over the pricing and sale of all liquors. *Cf. Rice v. Alcoholic Beverage Control Appeals Bd.,* 21 Cal.3d 431, 146 Cal.Rptr. 585, 579 P.2d 476 (1978) in which the prices were established by the producers with the state exercising no control or pointed re-examination of those prices to insure that policies of the Sherman Act are not unnecessarily subordinated. 21 Cal.3d at 445, 146 Cal.Rptr. at 594, 579 P.2d at 486. While the Court indicates that the threshold question is whether the action violates the Sherman Act, *Midcal,* 445 U.S. at 102, 100 S.Ct. at 941, the threshold question in that inquiry is the extent of direct control and supervision of the activity by the state, such as to provide *Parker* immunity. 445 U.S. at 103–104, 100 S.Ct. at 942. It is only after a failure at this hurdle that the Court must continue on to examine the extent of the state's mandate and review of the activity. Obviously if the Court had found direct state action and control there is no need for further examination.

**41.** *See* n. 18, *supra.* This two-prong analysis was reaffirmed in the recent *Community Communications Co., Inc. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). *City of Boulder* also reaffirmed the state's powers and immunity as a sovereign under the Constitution. 455 U.S. at 53, 102 S.Ct. at 842. In advancing the *Midcal* analysis, the High Court merely declined to "automatically" extend the state sovereign's right to *Parker* immunity to "cities, counties, and other organized bodies." *Ibid.*

**42.** *See* n. 32, *supra,* for full text of § 261–4.

enter into contracts, leases, licenses, and other arrangements with any person:

\*     \*     \*     \*     \*     \*

(2) Conferring the privilege of supplying goods, commodities, things, services, or facilities at the airport or air navigation facility . . . .[43]

Further, per § 261–7, the DOT may establish the "terms and conditions of the contract".[44]

This language is reiterated in H.R.S. § 261–9—Contracts, law governing;[45] and H.R.S. § 261–10—Exclusive rights prohibited.[46] In the latter, while the state forbids exclusive contracts as to the "use of an airway, landing area, or air navigation facility," the section also specifically says

"[t]his section shall not prevent the making of contracts, leases, and other arrangements pursuant to section 261–7."[47] This broad grant of authority to the DOT is limited only by directives to manage the airport system in the best interest of the public and to generate sufficient revenue to support the statewide airport system. There can be no reasonable doubt that the state has authorized the DOT to act as its agent in the managing and financing its airport system.

Additionally, the expressed goals of this legislation, as stated in H.R.S. § 261–11, are that the airport system is to be "used for public and governmental purposes and as a matter of public necessity".[48] The exercise of these powers is considered to be "public and governmental functions."[49] This clear-

---

**43.** See n. 34, *supra,* for full text of § 261–7.

**44.** *Ibid.*

**45.** Haw.Rev.Stat. § 261–9:

§ 261–9 *Contracts, law governing.* The department of transportation may enter into any contracts necessary to the execution of the powers granted it by this chapter. All contracts made by the department shall be made pursuant to the laws of the State governing the making of like contracts; provided, that where the planning, acquisition, construction, improvement, maintenance, or operation of any airport, or air navigation facility is financed wholly or partially with federal moneys, the department may let contracts in the manner prescribed by the federal authorities acting under the laws of the United States and any rules or regulations made thereunder. [L 1947, c 32, pt of § 1; RL 1955, § 15–15; am L Sp 1959 2d, c 1, § 26]

**46.** Haw.Rev.Stat. § 261–10:

§ 261–10 *Exclusive rights prohibited.* The department of transportation shall grant no exclusive right for the use of an airway, landing area, or air navigation facility under its jurisdiction. This section shall not prevent the making of contracts, leases, and other arrangements pursuant to section 261–7. [L 1947, c 32, pt of § 1; RL 1955, § 15–16; am L Sp 1959, 2d, c 1, § 26]

**47.** Read in conjunction with the broad powers enunciated in § 261–7, it is clear that the legislature has considered and condones the use of exclusive contracts by DOT and its various concessioners. Indeed in one case the legislature experimented in 1981 (H.B. 1470, Act 243 of the 1981 Session Laws) with specifically requiring the DOT to provide at least two duty-free in-bond concessions at the airport and then

finding that unacceptable, not only returned the statute to the status quo, but mandated a sole source duty-free in-bond concession at the airport. (Act 90, S.B. 2261–82 S.D.2 of the 1982 Session Laws.) This approval of exclusive contracts by the legislature emphasizes the already clear mandate by the state that DOT has the power and authority to enter such contracts with such parties as will best serve the public's interest and provide adequate funds for the airport system. See also nn. 32, 33 & 35, *supra.*

**48.** See n. 33, *supra,* for full text of § 261–11.

**49.** *Ibid. See also* Haw.Rev.Stat. § 261–12:

§ 261–12 *Rules, standards.* (a) Powers to adopt. The director of transportation may perform such acts, issue and amend such orders, adopt such reasonable general or special rules and procedures, and establish such minimum standards, consistent with this chapter, as the director deems necessary to carry out this chapter and to perform the duties assigned thereunder, all commensurate with and for the purpose of protecting and insuring the general public interest and safety, the safety of persons operating, using, or traveling in aircraft, and the safety of persons and property on land or water, and developing and promoting aeronautics in the State. No rule of the director shall apply to airports or air navigation facilities owned or operated by the United States.

In furtherance of the duties assigned under this chapter, the director may adopt rules relating to:

(1) Safety measures, requirements and practices in or about the airport premises;

(2) The licensing and regulation of persons engaged in commercial activities in or about the airport premises;

ly satisfies the first prong of the *Midcal* test.

The second prong of the *Midcal* analysis compels this court to determine if the DOT, in its contracting and management of the airport system, is actively supervised and subjected to "pointed re-examination" of its policies by the state.[50]

Since the DOT is a state agency,[51] which must submit budgets and is funded by the state,[52] and whose director holds his office at the whim of the governor,[53] it is abundantly clear that the actions of the DOT are subjected to "pointed re-examination" by

(3) The regulation of equipment and motor vehicles operated in or about the airport operational area;

(4) Airport security measures or requirements, and designation of sterile passenger holding areas and operational areas;

(5) The regulation of motor vehicles and traffic;

(6) Any other matter relating to the health, safety and welfare of the general public and persons operating, using, or traveling in aircraft.

(b) Definitions. For the purpose of this section, if not inconsistent with the context:

"Sterile passenger holding area" means any portion of a public airport designated by the director and identified by appropriate signs as an area into which access is conditioned upon the prior inspection of persons and property in accordance with the approved Federal Aviation Administration air carrier screening program.

"Operational area" means any portion of a public airport, from which access by the public is prohibited by fences or appropriate signs, and which is not leased or demised to anyone for exclusive use and includes runways, taxiways, all ramps, cargo ramps and apron areas, aircraft parking and storage areas, fuel storage areas, maintenance areas, and any other area of a public airport used or intended to be used for landing, takeoff or surface maneuvering of aircraft or used for embarkation or debarkation of passengers. Notwithstanding the restriction on access by the public into operational areas, entry may be authorized for airport operational area related purposes with the prior permission of the director or his duly authorized representative.

(c) Conformity to federal legislation and rules. No rules, orders, or standards prescribed by the director shall be inconsistent with, or contrary to, any act of the Congress of the United States or any regulation pro-

the state. By statute as well, H.R.S. § 261–7, the DOT is mandated to "actively supervise the operation of the contractors to insure its effectiveness. The department shall develop and implement such guidelines as it may find necessary and proper to actively supervise the operations ... [and review] the reasonableness of contractors' price schedules ...."[54]

From the above, it is manifest that the DOT is, from every aspect, an instrumentality of the state. To ask if the state controls and reviews the DOT is to simply ask if the state exercises control over and governs its own actions.

mulgated or standard established pursuant thereto.

(d) How made. All rules having the force and effect of law, shall be adopted by the director pursuant to chapter 91.

(e) Distribution. The director shall provide for the publication and general distribution of all of its rules and procedures having general effect. [L 1947, c 32, pt of § 1; RL 1955, § 15–18; am L Sp 1959 2d, c 1, § 26; am L 1965, c 96, § 11; HRS § 261–12; am L 1980, c 155, § 1]

**50.** Of course when one considers that the DOT is composed of officers and agents of the state, the question becomes facetious. But for the sake of argument and in the hopes of exposing exactly why a *Midcal* analysis is unnecessary in such cases as this one, the court will overlook this obvious discontinuity. Especially since at least one other judge, sitting by designation in this district, overlooked this relationship and failed to grant the DOT state-action immunity for a similar exclusive concession contract at HIA, this court wishes to spell out quite clearly this symbiosis. *Cf. Lei, Inc. v. Photo Management, Inc.,* Civ. No. 78–0263 (Opinion & Order filed February 4, 1980, by Judge Stanley Weigel). In short, the DOT is but an instrumentality created by the state to conduct certain specific state policies. The DOT exists only because of the state's grant of authority and only to perform the specific mandates outlined in its Organic Act. *See* nn. 51 & 53, *infra,* and accompanying text.

**51.** The Department of Transportation was created by Haw.Rev.Stat. § 26–4(15) (1976); and is a unit within the office of the governor.

**52.** *Ibid.*

**53.** Haw. Const. Art. V, § 6.

**54.** *See* n. 34, *supra,* for full text of § 261–7.

The tautology is complete. The DOT, as an agent and instrumentality of the state, is controlled and reviewed constantly by the state. Since the DOT accounts directly to the state, and the state is merely acting through its agent, which performs and controls the action, this court can hardly imagine how the *Midcal* analysis could fail to be satisfied.[55] As indicated above, in such situations as the present case, the *Midcal* test is simply not necessary to be made. But if made, as here done, it will almost certainly be met.

CONCLUSION

This court finds that the DOT is an instrumentality of the State of Hawaii. As such, the DOT's acts in regard to certain exclusive contracts at HIA are the acts of the state. Further, those acts relate to a fundamental governmental function, that is, the building, maintaining, managing and financing of a necessary statewide airport system for an island state. In so operating, the acts of the DOT are entitled to *Parker v. Brown* immunity against any claims of alleged violations of the Sherman Act.

For reasons heretofore stated, this court has considered and applied a *Midcal* analysis. The application of this superfluous analysis confirms this court's earlier conclusion. When the state is acting through one of its instrumentalities, the *Midcal* analysis logically should be satisfied automatically. The *Midcal* two-prong test having been met, the DOT's actions are entitled to the same *Parker v. Brown* immunity to antitrust suits as the state.

This court finds it unnecessary to consider the remaining claims of the plaintiff's complaint.

IT IS HEREBY ORDERED that plaintiff's motion for summary judgment is DENIED; and defendants' motion for summary judgment is GRANTED.[56]

**55.** Perhaps it is logically possible to postulate the ultimate "right hand in ignorance of the left hand's acts" sort of situation. But then the courts would be forced to decide which "hand" was the state.

**56.** *See* Order Granting and Denying Motions for Summary Judgment, filed on September 2, 1982. *See also* n. 1, *supra*.